May it please the court. Counsel. Counsel. Students. My name is John Berry and I represent the appellant Robert Mayfield. We raised a lot of issues in this brief and what I want to talk about first is what I believe is most important, which is the jail calls that were recorded in conversations between Mr. Harris and Mr. Mayfield. Now Mr. Harris and Mr. Mayfield were brothers and the reason why these are so important is because this is a case where the evidence is mostly from three cooperating witnesses, none of whom bought or sold methamphetamine from Mr. Mayfield. This is what we would refer to as a dry conspiracy. The hearsay statements by Harris don't meet the requirements of Bell. Specifically, the phone calls were not during the course of the conspiracy and were not in furtherance of the conspiracy. We have recorded jail calls after Mr. Harris has been arrested. Now all the co-conspirators who testified, the three of them, all said that the conspiracy took place between August and December of 2014. Mr. Harris was arrested in February of 2015. So by the time alone, and I understand that an arrest is not going to necessarily stop a conspiracy, but in this case, all of the activities testified to ceased at the time. Let me just stop you for clarification. You said that Mr. Harris's statements were not established to be in furtherance, but as I understand the conversation, at one point the brother, presumably Mr. Mayfield, inferentially, said something about, I've been there in Reno, I don't talk, we'll get you a lawyer. Correct. Now were you including those statements as not in furtherance or were you carefully just saying, referring to what Harris said over the phone to his brother? Because those statements pretty clearly are in the sense of one conspirator telling another, don't worry, don't talk, we'll get you out of jail, you don't really have any trouble. So what were you including in your- Right. And that's a great point, Your Honor, because Harris's statements are hearsay that do not fit the exception under Bell. My client's statements, Mr. Mayfield's statements that you just discussed, the objections I had with those are that they're unfairly which is Harris, the guy in jail, and the other evidentiary issues are 403 unfairly prejudicial and irrelevant for the statements that Mr. Mayfield made in response to Mr. Harris. And so my concern about one of the statements, I did a stretch in Reno. That statement, Mr. Mayfield saying that he did time in Reno is unfairly prejudicial. The court found that the conviction was too old and found that it was not relevant. There was a motion in limine filed, the court sustained that motion in limine, so the conviction did not get in, but the prejudicial effect of that conviction still got in. The fact that my client had done time in prison or jail in Reno was not relevant to the case. It could have been just an arrest from what he said. Correct. But it has an unfairly prejudicial effect because it makes him sound like a criminal. Well, what's unfair about it? I agree it's prejudicial, but one conspirator saying to another, don't worry about being arrested. This happened to me in Reno. I'll get you an attorney and you got nothing to worry about. It seems to me that's a classic in furtherance of continuation of what they're doing. And I mean, it's prejudicial if you're being arrested is not all that prejudicial. And in this context, I don't see the unfairness. Well, Your Honor, I would disagree. I think that any time that someone mentions being in prison, that it has an effect on the jury, that this person is a criminal. People who are not criminals do not go to jail, do not get arrested. So I respectfully disagree. I think when we look at the role of the United States, the fact that they're brothers, you know, is not or that they have a relationship is not enough to establish that they're involved in a conspiracy and neither is idle chatter or informative statements. But will you concede that statements designed to protect the conspiracy are in furtherance of it? Yes, I will concede that. And I believe the case law is pretty clear that if it's to protect the conspiracy, then so be it. So clearly the be quiet, I'll get a lawyer. Everything will be OK. Part of it is 801 D2E. Not necessarily, though, based on the relationship. When I hear the conversation between Mr. Mayfield and his brother who's in jail, it sounds like the advice I would give to a client or any other defense attorney. Hey, don't talk to anybody. You need to get a lawyer. But when it's coming from a co-conspirator, it's designed to protect the conspiracy, right? If it's established that person was a co-conspirator and that's that's my problem with this case. There were three people, I think, that could have nailed this down and met the second prong of Bell. But I don't think that happened. And, you know, there was Zach Love. He was the one that all three informants said was the person that Mayfield was giving the methamphetamine to. Zach Love never testified. Mr. Harris never testified. And the third person that these cooperating witnesses identified was a guy named Tim, who they said, yeah, Tim got doped from Mayfield. He never testified either. So at that point, we have hearsay statements that aren't even corroborated between the three cooperating witnesses, other than the fact that they all say that they know Mayfield or they witnessed Mayfield deal with somebody else, but they never dealt with him heard from that someone else that got methamphetamine from Mr. Mayfield. So in order for the third prong of Bell, just statements made during the course of and in furtherance of a conspiracy, the issue I have is that the co-conspirator arrest, you know, while not being a withdrawal from conspiracy, if we go back to Cruel Witch versus United States, post-arrest statements are inadmissible when the aim of the conspiracy was foiled by the arrest. And in this case, once Harris is arrested, there's nothing else. And in fact, two months prior to Harris being arrested, we have no other evidence from testimony of the three cooperating witnesses that Mr. Mayfield was involved in the conspiracy. So the conspiracy was done. You can still be trying to protect the conspiracy after the arrest, can't you? It's certainly that's possible if there's evidence that the conspiracy is ongoing. When when was the when was the defendant in jail with with Rupert? That was November of 2016, your honor. So when when were these when when did the three cooperators who testified talk about love, bragging about their talking about the Cali boys? Was it wasn't that that was after the time alleged in the indictment? I believe I believe you're correct, your honor. That read to me like evidence of a continuing conspiracy. Well, I suppose my argument is is the opposite of that. The fact that they are now proffering and the conspiracy, they're all off the street. They've been arrested. They're proffering. They're no longer participating. But when did they say they heard the love told them about who his source was? I didn't get the timing. Okay, sure. My my understanding was that was in 2015 after they had been all of them had been arrested, I believe, sometime in 2015. And once again, those statements were given around the time that Mr. Harris was in jail. Now, so so there's your there's your evidence of of a continuing conspiracy, not just doesn't doesn't prove that Mayfield was part of it, but it shows that that things went on beyond the time alleged in the indictment and beyond Harris's arrest. Well, I don't know, because there's no evidence of that. The there's the there's the cooperator's testimony. Sure. But when they testified, they didn't testify events going past December of 2014. Well, then when did I see you just I don't use me on the timing. When when did they say that love identified their source to them? This was between August and December of 2014. I'm sorry, I think I misunderstood your question. I think we got into the timing of the proffers. So I'm talking about the timing of the events that that demonstrate or fail to demonstrate in furtherance. Correct. Okay. So maybe I should slow down and just go back to my understanding of the timeline. That would be okay for that would be good. So my understanding is that there was initially a conspiracy began around the summer of 2014 and ended in December of 2014. During that time, Mr. Love made statements to some of his co-conspirators that he was getting drugs from the Cali boys. All the statements regarding the drug dealings and Mr. Love getting his drugs from the Cali boys ended in December of 2014. And why do I mean, how do we know what evidence is there that it ended? Well, I think Mike and I don't know your honor that my issue is there's no evidence that it continued. When was it? Harris was arrested in February, February 2015, your honor. And what for what event? Well, it was actually an accidental, I guess a fortuitous event where law enforcement were going to the house, a house to search for somebody else. They found drugs there. And I believe Mr. Harris was there. They got a warrant and that's how they learned about Mr. Harris's involvement. And so Mr. Harris was arrested pursuant to a separate investigation. And and so my position is that then we have no evidence of any activity going past December. So by the time Harris is arrested, Harris doesn't lay out a plan to continue the conspiracy. And neither does Mr. Mayfield. They're talking as if they're they're brothers at some point. Yet Mr. Mayfield probably gives some legal advice, but he's not furthering the conspiracy. And and once again, there's there's no evidence that the conspiracy is continuing at this point. And I think the issue is that the judge has to find by a preponderance of the evidence that the statement was made in furtherance of the this this conspiracy and and the evidence just isn't there. And so as we made the bell findings before the calls, the tape calls were played, according to the government, that that's correct. The appellate. So you're saying those were clarifying? I am, Your Honor. I think the way the judge phrased it, that the evidence was in equipoise when he made the tentative finding, he said, you know, I can see how these would be statements to the family, but I can also see how they would be statements in furtherance of a conspiracy. So that's that's not by a preponderance of the evidence at that point. At that point, the evidence is in equipoise. It's 50 50. So I believe the judge used the wrong standard when he articulated on the floor, all the Amtrak and other evidence. Yes, Your Honor. So so that all counts in the ultimate preponderance issue. It does, Your Honor. OK. And, you know, my concerns with that is that they did not identify the specific army, Mayfield or Robert Mayfield. At this time, I'd like to reserve the remainder of my time for rebuttal. Thank you. Ms. Fullerton. Good afternoon, Your Honors. May it please the court, counsel, ladies and gentlemen. I'm Sarah Fullerton. I'm an assistant U.S. attorney with the District of Nebraska in the United States. If I can try and help clear up the timeline here a little bit. The evidence showed that Mr. Love and Mr. Johnson, Mr. Ibarra, Mr. Rupert were involved in dealings together beginning in the summer of 2014. I think a couple of the witnesses testified that this kind of started when they were watching the NBA finals together. So probably late June, early July of 2014. And then the information that they had about Mr. Love, the things that he said to them continued until, depending on who it was, up to sometime in December of 2014. That's during the time period that they were talking with Mr. Love, that they were getting amphetamine from him. A couple of them dropped off, at least Mr. Johnson, I think dropped off earlier than that because there was a falling out that he had with Mr. Love. But at any rate, we know that at least some of the witnesses were still talking to Mr. Love about this into December of 2014. And at that point, then that's the last they have with Mr. Love. But it's clear that this conspiracy continued beyond that point because about two months later in February, Mr. Harris gets arrested with a large quantity of methamphetamine and some guns. And the first thing he does when he gets taken to jail is start making phone calls to his brother, Rob. And Rob was how all these witnesses had described Mr. Love's source. Johnson and Ibarra had both seen Rob. They'd both seen Love involved in drug transactions with Rob. And so they knew who Rob was. They knew that Rob was Dee or Dugga's brother. And Harris was Dee or went by Dee, went by Dugga. When they took his phone, there was a phone number in there for Rob, a California phone number. That's the number that he was calling from the jail that's recorded on the jail calls. And from the context and everything that came in before this, which included the and all that information, by the time the jury heard this, they knew who Rob was. And so Rob was the defendant. He's involved in these conversations with Mr. Harris, who's clearly from the witness's testimony, a member of this conspiracy. And one thing that hasn't been mentioned is that the defendant's statements are with respect to Mr. Harris's statements on those phone calls. There weren't all that many of them, actually. Most of the conversation is Mr. Mayfield telling Mr. Harris what to do and what not to do. Mr. Harris mentions that they found the drugs. Mr. Harris mentions that they found the gun, all things the jury already knows because of the search. The one thing that he does say, however, in one of the calls that clearly pulls Mr. Mayfield into the conspiracy and shows that they're both still part of a conspiracy is that he asked Mr. Mayfield to go to a guy that owes him money and collect it so the money can be used to hire his attorney. So that particular statement shows that the two of them are still telling Mr. Harris what to do and Harris by asking, hey, I've got a guy who owes me money, go collect for him, and we can use it to pay for my lawyer. So they're working together to protect this conspiracy. So Mr. Harris's statements are still co-conspirator statements and they were properly admitted. Do you dispute that Judge Girard's findings under Bell indicated that he perceived the evidence as being an equipoise? I don't know that I would use that term. I think Judge Girard spent a great deal of time, as I'm sure you're aware from looking at the phone calls and what parts of the phone calls were properly admitted. He had asked for them in advance. He listened to them. He gave us direction on how he wanted them redacted. And so I don't think it was in equipoise that he made that finding. That's my point. Given Judge Girard's experience as a trial judge, given the record that he made, there may be some precision. He says, well, I can see how it could go either way. It didn't strike me as I read it, that that was a judge saying, you know, I find the evidence to be in equipoise and wouldn't a reasonably prudent trial judge understand that evidence in equipoise is insufficient to satisfy the Bell requirements? I believe so, Your Honor. And I also believe that, as we discussed, based on the amount of consideration that Judge Girard had given this before allowing those tapes to finally come in and be played for the jury, I think he was quite satisfied that there was sufficient evidence. So what I think he's saying is, yeah, defense counsel, you could argue that. But that's not what I think. So that's my interpretation of that statement. If there are no other questions, I will sit down. Thank you very much. Let me, Ms. Fullerton, I think it's clear from the description of the timeline, but I wanted to ask, was it clear from the context that when Love was identifying his source to the testifying conspirators, he wasn't just bragging or giving information, he was talking to customers or potential customers? Oh, sure. I think that was quite evident. And I think the fact that two of those witnesses actually saw him and heard that that was the methamphetamine to Love, I think it's clearly more than just bragging. Yeah, there was testimony that... And that's important in our Raglan case. Right. I mean, there was testimony that Love was a bragger. Used to be part of distributing or buying and selling drugs or sharing drugs and not just, oh, hey, look what I've been doing. No, I think what he was doing, and I think the evidence from the witnesses, the testimony was pretty clear, was that he was assuring them that he had a reliable source of dope. They wanted... Therefore, keep dealing with me. Correct. Keep coming to me. I've got a good source. We can get a good price, basically, and it will be ongoing and you will be able to continue getting methamphetamine because this guy's bringing in large amounts from California. So that's how I see that, Your Honor. Any other questions? Thank you. Does Mr. Berry have some time? Yes, Your Honor. Okay, for rebuttal. Thank you, Your Honor. Just to clarify, yeah, as far as the money goes, the $500 that Mr. Harris asked his brother to collect for him, we don't know that that's a drug transaction. We just know that we have a man who's in jail, who's desperate to get out, wants to hire a lawyer. I don't think that anybody asking someone, hey, collect money, get bond money, get lawyer money, we hear that all the time. That generally is not in for the conspiracy, but rather someone who is desperate to get help who is in jail. The second issue is I think the testimony from most of the witnesses was that Love was a braggart. Zach Love liked to go out and brag about what he was doing and who he was dealing with. And I think that the raglan is instructive on that where we get these braggarts who like to go out there and talk about things. And what's so problematic is that Love never testifies. So Love's out there bragging about how he's dealing with these two Cali boys and supposedly this guy named Rob. And yet we never hear Love testify. So we don't really know to the extent that he was just bragging. I mean, at the end of the day, this is a case primarily built on hearsay statements from cooperating witnesses who all had, they may have claimed to have seen some transactions, but I think as you look through the record, you'll see that they really don't have a good grasp as to what happened. I don't believe any of them ever said, I saw money and drugs exchange hands. And so they said, no, he went inside and came out with drugs, or there was a handshake and he had drugs. And none of these individuals claim to have dealt directly with Mayfield. And so we're one step removed. And that's why the phone call becomes so important because those statements that were hearsay on behalf of Harris and unfairly prejudicial and irrelevant on behalf of Mayfield, I think had a great impact on this trial. And I'm asking the court to find that those statements should not have been allowed by the court to reverse and remand for new trial. Thank you. Thank you, counsel. Case has been well briefed and argued, raises important issues, and we will take it under advisement. Does that complete the argument? Yes, your honor. Court will be in recess until 8 30 tomorrow morning. Let me say to the